LAURA B. GREENE,                    )
                                    )
       Plaintiff,           )
                                    )
  vs.                             )
                                    )      ORDER
                                    )
SHAPIRO & INGLE, LLP,               )
                                    )
       Defendant.           )
_____ )

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment, (Doc. No. 24); its Memorandum in Support, (Doc. No. 34), Plaintiff's Response in Opposition, (Doc. No. 40); Defendant's Reply, (Doc. No. 44); Plaintiff's Motion to Strike Defendant's Reply, (Doc. No. 50); her Memorandum in Support, (Doc. No. 51); Defendant's Response in Opposition, (Doc. No. 52); and Plaintiff's Reply, (Doc. No. 53). The two motions are ripe for adjudication. For the reasons set forth below, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion to Strike Defendant's Reply.

## I.   BACKGROUND

### A.   Procedural Background.

Laura B. Greene ("Plaintiff") filed her Complaint, (Doc. No. 1-1), against Shapiro & Ingle, LLP ("Defendant") on May 9, 2017, in the Superior Court of Mecklenburg County, North Carolina. On May 17, 2017, Plaintiff's case was removed to the Western District of North Carolina. (Doc. No. 1). On October 24, 2017, Plaintiff

filed a Motion to Compel Discovery, (Doc. No. 14), which the Magistrate Judge granted and denied in part, (Doc. No. 20 at 6). Plaintiff filed a second Motion to Compel Discovery, (Doc. No. 22), on February 22, 2018, which the Magistrate Judge granted on March 30, 2018, (Doc. No. 48). This second order by the Magistrate Judge set April 9, 2018, as the deadline for Defendant to provide full discovery responses. (Doc. No. 48 at 4). It also required Defendant to reimburse Plaintiff for her reasonable costs and fees associated with preparing and filing her second motion and its supporting memoranda. (Id.). On March 1, 2018, Defendant filed its Motion for Summary Judgment, (Doc. No. 24). On April 5, 2018, Plaintiff filed a Motion to Strike Defendant's Reply in Support of its Motion for Summary Judgment, (Doc. No. 50), arguing that it relied on evidence presented for the first time. Oral arguments regarding Defendant's Motion for Summary Judgment were heard on May 31, 2018.[1]

B. Factual Background.

Plaintiff is an attorney residing in Gaston County, North Carolina. (Doc. No. 1 ¶1). Defendant is a law firm with offices in North Carolina, Tennessee, and Alabama. (Id. ¶2). From January to September of 2015, Defendant employed Plaintiff as a salaried attorney in its Charlotte, North Carolina office. (Id. ¶6, 22). Throughout the hiring process, Defendant made known it valued Plaintiff's dual licensure in North Carolina and Tennessee. (Id.). Defendant also understood that

---

[1] The parties have filed their memoranda and exhibits under seal. This Court modifies the sealing order to the extent it refers in this Order to material previously filed under seal.

Plaintiff was in the process of completing her LLM degree in taxation through online classes. (Id. ¶7).

By February of 2015, Plaintiff began working in Defendant's Title Department alongside Title Manager, James Albert, and legal assistant, Matt Hill. (Id. ¶9). As she began her new role, Plaintiff participated in email communication with coworkers that would frequently shift from business to personal matters. (Id. ¶11). Of particular note are those communications between Plaintiff and Title Manager Albert. (Id. ¶12).

### 1. Interactions with James Albert

Emails and interactions between Albert and Plaintiff began professional but, as Plaintiff tells it, soon became "inappropriate and sexual in nature." (Id.). Albert began commenting to Plaintiff on the attractiveness of other female employees. (Doc. No. 40 at 7). He opined on others' weight, how he favored short skirts, and asked which of Defendant's employees were pursuing sexual relationships with each other. (Id. at 7–8).

Plaintiff alleges that Alberts comments to her constituted sexual harassment. In doing so, Plaintiff points to various emails Albert sent her throughout the summer of 2015 that she claims "crossed a line." (Id.). While Plaintiff's brief supplies Albert's comments in isolation, a more accurate portrayal of his comments in the record are as follows:

- In an email where Plaintiff asked Albert, "So how late do you have to stay? I saw you in there, having a meeting. Do you have to sleepover?" Albert responded, "Are you staying to sleep over with me?" Plaintiff

emailed Albert back, "No, I am not Matt Hill, therefore I do not desire to sleep on the couch in the breakroom." (Doc. No. 40-18 at 9–10).

- When Plaintiff forwarded Albert several Title numbers, Albert responded, "I didn't review [one of those titles], I passed it on to [another employee] who did the review… do you have me on your mind?" (Doc. No. 40-22 at 3–5).

- In an email where Plaintiff asked Albert if he had Tylenol in his office for her migraine, Albert responded that he was out. Plaintiff stated, "And guess you didn't ever want me to come visit again since you ate all the Tylenol." Albert responded, "You can visit me whenever you want, I'm yours for the taking." (Doc. No. 40-18 at 11–13).

- When Albert answered a business-related question from Plaintiff, she responded, "Thank you! Yes, I seriously though [sic] that a non-moron would know these are available online. I will take you to [V]egas … If they ever give me raise.... Haha." Albert stated, "It'll be a blast!" Plaintiff then asked Albert if his wife would want to go and Albert responded that he wasn't planning on bringing her. Plaintiff continued, asking, "Isn't she down to parttty?" Albert later asserted that he "deserve[d] some alone time." Plaintiff responded, "Haven't you see[n] the hangover? You can just drug yourself for fun." After Plaintiff mocked Albert's apparent interest in the game Dungeons & Dragons, she stated he should go to a "D&D fest" in Las Vegas. It was only then that Albert stated, "Don't mock, you know you'd want to come." (Doc. No. 40-22 at 6–12).

- In another email, Plaintiff told Albert that she had a sprained ankle with a bug bite. "It is huge and itches," Plaintiff wrote. Albert responded by asking, "Do you want me to starch [sic] it for you lol?" Albert then corrected himself, saying that he meant "Scratch it… or whatever you need." When Plaintiff stated that all she needed was bug spray and a bandage, Albert wrote, "Ok, was just trying to nice and help ya out, I have some magic hands." (Doc. No. 40-19 at 3–6).

As the excerpts above show, Plaintiff contributed to the conversations with Albert. For example, Defendant points out that Plaintiff sent Albert an email commenting on a "hot guy." (Doc. No. 25 at 8) (citing Doc. No. 25-2 at 34). Several employees saw Plaintiff enter Albert's office frequently. (Id. at 9). While Plaintiff

claims her visits to Albert were because he was a notary, a number of notaries were employed throughout the building. (Id. at 10).

As far as Albert's outward conduct toward Plaintiff goes, he never threatened Plaintiff or touched her sexually. (Doc. No. 25 at 3); see also (Doc. No. 25-11 at 48). Rather, Plaintiff admits that Albert's behavior remained "along the lines of these more subtle innuendos and whatnot in [their] conversations." (Doc. No. 25-11 at 48).

### 2. Plaintiff's Reports to Defendant

Plaintiff states that she reported Albert's comments to Defendant multiple times. First, Plaintiff states that she made verbal comments to Michelle Toney, a human resource ("HR") specialist, during the week of May 21, 2015. (Doc. No. 40 at 9). During this verbal meeting with Toney, Plaintiff said that Albert could be vindictive and made inappropriate comments. (Doc. No. 40-1 at 32). Plaintiff admitted that she did not use the words "sexual harassment" with Toney, but she attempted to relay that Albert would say "weird things." (Id. at 33). Plaintiff told Toney that she believed she had to entertain Albert's comments or he would not help her professionally. (Id.).

Plaintiff's second verbal complaint occurred in either late June or early July of 2015. (Doc. No. 40 at 9). On August 4, 2015, Plaintiff began emailing Toney. (Doc. No. 40-2 at 8). Plaintiff forwarded Albert's email where he stated that his "magic hands" could help Plaintiff's bug bite on her ankle. (Doc. No. 40 at 9). Then, on August 26, Plaintiff emailed Toney again, attaching a message Albert sent via "G-chat" stating, "U r killing me smalls." (Doc. No. 40-19 at 8). This comment was sent

in response to Plaintiff's complaints to Toney. (Doc. No. 40 at 10). That same day, Toney emailed Elizabeth Ells, the firm's operations manager, and stated that "[Plaintiff] wants [Albert] to treat her professionally and to stop communications that do not have anything to do with work." (Doc. No. 40-21 at 1). Toney asked if she should talk to Albert about his "unprofessional communications." (Id.). Ells replied, "Yes, speak to James. Although you told me Laura Greene keeps showing up in his office." (Id.).

Plaintiff's last report occurred on August 31, 2015, when she met with Ells and Grady Ingle, the firm's managing partner. (Doc. No. 40 at 11). At this meeting, Plaintiff alleges that Ingle advised Plaintiff to stay in her office and that she was the cause of Albert's comments. (Id.). Ells asked Plaintiff if she wanted to transfer to the bankruptcy department. (Id.). Plaintiff alleges that Ells told her that Plaintiff was "either with us, or against us." (Id.). In the end, Ells and Ingle concluded that they would transfer Plaintiff to the firm's bankruptcy practice. (Id.). The group also agreed to meet again in September to discuss a pay increase for Plaintiff. (Id.).

### 3. Plaintiff's Job Performance

Throughout Plaintiff's interactions with Albert, she continued to do her job. Plaintiff states that she often worked more than 8 hours per day and 40 hours per week. (Doc. No. 40 at 6). Defendant, however, states that Plaintiff continually took an excessive number of absences and habitually arrived late to the office. (Doc. No. 25 at 4). Defendant presents emails showing at least 57 instances of attendance issues in Plaintiff's eight months of employment. (Doc. No. 45 at 9). Plaintiff sent

these emails notifying Toney that she was either running late for work or had to leave early.  See (Doc. No. 25-13 at 1–102).  Plaintiff's absence from the office not only resulted from her LLM classes, but also from various doctors' appointments, sick days, and issues with her car.

### 4. Plaintiff's Termination

On September 14, 2015, Defendant terminated Plaintiff—two weeks after her August 31st meeting with Ells and Ingle.  (Doc. No. 40 at 11).  The decision was made jointly by Ingle, Toney, and Ells.  (Id.).  Defendant cites Plaintiff's absences and tardiness as the basis for its decision.

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law. Id.  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving

party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. Id. at 249-50.

B. Discussion

Plaintiff's Complaint includes Title VII claims for sexual harassment / hostile work environment and retaliatory discharge, as well as violations of North Carolina's Wage and Hour Act. (Doc. No. 1-1). In its Motion for Summary Judgment, Defendant challenges Plaintiff's Title VII claims only, but requested during oral argument that,

if relief is granted on these federal claims, the Court should return the remaining state law claim to the Superior Court of Mecklenburg County, North Carolina.

1. Sexual Harassment / Hostile Work Environment

The protection of Title VII extends to discriminatory or abusively hostile environments. Harris v. Forklift Sys., 510 U.S. 17, 21 (1993). "To demonstrate sexual harassment …, a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's sex…; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Okoli v. City Of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011). The Court finds that Plaintiff fails to establish the third element.

Establishing severe or pervasive conduct requires some unpacking. "The 'severe or pervasive' element of a hostile work environment claim has both subjective and objective components." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008) (internal quotations and citations omitted). "First, the plaintiff must show that [s]he subjectively perceived the environment to be abusive. Next, the plaintiff must demonstrate that the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." Id. The Fourth Circuit has said proving the severe/pervasive element is a high bar. Not just any offensive conduct will suffice. After all, "Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). To be successful, plaintiffs must "identify situations that a reasonable jury might find …. instances where the environment was pervaded with discriminatory conduct

9

aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." <u>Sunbelt Rentals, Inc.</u>, 521 F.3d at 316 (internal quotations omitted).

Plaintiff fails to show pervasive conduct. Plaintiff testified in her deposition that her alleged sexual harassment "was ongoing and repetitive throughout the entire thing…." (Doc. No. 44-11 at 3). However, Albert's comments were a fraction of hundreds of emails exchanged between himself and Plaintiff—over 15,000 pages worth. (Doc. No. 25 at 3). What's more, the comments Albert sent Plaintiff, while boorish and offensive and not appropriate for the workplace, fail to reach the level of severity the Fourth Circuit has established to succeed on a sexual harassment/hostile workplace claim. For instance, in <u>Hartsell v. Duplex Prod., Inc.</u>, the Fourth Circuit did not find sufficiently severe or pervasive demeaning comments when an employee: (1) in reaction to seeing a magazine picture of a buxom model wearing a lowcut T-shirt, asked, "why don't we have sales assistants that look like that[?]"; (2) expressed a desire to make the plaintiff "cry like a baby"; (3) told plaintiff she would become his "slave"; (4) questioned whether after the birth of a child the plaintiff would be a "mini-van mommy" or "be a salesperson and play with the big boys"; and told the plaintiff to "go home and fetch her husband's slippers." 123 F.3d 766, 768-69 (4th Cir.1997).[2]

---

[2] <u>Hartsell</u> is cited in <u>Singleton v. Dep't of Corr. Educ.</u>, 115 Fed. Appx. 119 (4th Cir. 2004). Although unpublished, <u>Singleton</u>'s facts are also indicative of the type of "boorish and offensive" conduct that does not cross the high bar of severe and pervasive conduct triggering Title VII relief. In that case, the Court assessed a supervisor who commented that the plaintiff should be "spanked;" stared at her breasts; measured the length of her skirt; told her it looked "real good; and told her if he had a wife as attractive as the plaintiff, he would not let her work at the prison facility. <u>Id.</u> at 120.

The point is not that this Court condones such comments—it does not—but rather that the conduct does not meet the high standard set forth under Title VII.

Cases in which the Fourth Circuit has found sufficient evidence of severe and pervasive misconduct warranting a jury trial stand in marked contrast to the facts developed in this record. In EEOC v. Fairbrook Medical Clinic, the plaintiff showed that her supervisor targeted her with highly personalized comments about her breasts and sex drive designed to demean and humiliate her in front of co-workers and the public. 609 F.3d 320, 328–29 (4th Cir.2010). In Mosby–Grant v. City of Hagerstown, the plaintiff showed that she was subjected to repeated comments regarding sexual encounters with young women and constant demeaning remarks about women resulting in her significant emotional distress. 630 F.3d 326, 336 (4th Cir. 2010). In contrast to these cases, Plaintiff's allegations fall short. Plaintiff admitted in her deposition that Albert's conduct was, at most, subtle and more in line of innuendo. (Doc. No. 25-11 at 48). Albert never touched Plaintiff in a sexual way, he never explicitly referred to wanting to engage in sexual contact with Plaintiff, he never threatened her, nor were his emails or comments alleged to have been made in front of others. (Doc. No. 40-1 at 29–30).

Plaintiff asserts that the severity of Albert's comments was further emphasized by his "managerial position." (Doc. No. 40 at 24). It is true that the status of an alleged harasser comes into play when assessing the severity or pervasiveness prong of a sexual harassment claim. "Simply put, a supervisor's power and authority invests his or her harassing conduct with a particular threatening

character." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (internal quotations omitted). But Plaintiff does not support her proposition that Albert was her supervisor. She does not state that Albright had any say in her termination or had any authority that would threaten her professional duties. At most, she alleges that Albright would become less responsive to her questions in emails if she did not go along with his otherwise "weird" or "odd" statements. Albert may have been a "Title Manager," but a mere job title does not mean that Albert could exercise the requisite control over Plaintiff.

### 2. Plaintiff's Retaliation Claim

Under Title VII, "'[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter.'" Id. at 272 (quoting Jordan v. Alternative Resource Corp., 458 F.3d 322, 338 (4th Cir. 2006)). In the absence of direct evidence, retaliation claims follow the McDonnell Douglas framework, where:

> the plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case 'drops out of the picture' and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). Here, Plaintiff succeeds in establishing her prima facie case, but ultimately fails to prove that Defendant's reason for her termination amounted to nothing short of pretext.

### a. Plaintiff's Prima Facie Case

To establish a prima facie case of retaliation under Title VII, Plaintiff must prove "(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events." Fontainebleau, 786 F.3d at 281 (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005)). Plaintiff meets these elements.

### i. Protected Activity

Defendant argues that Plaintiff did not engage in a protected activity because Plaintiffs' meetings and reports involving Albert had nothing to do with sexual harassment. (Doc. No. 25 at 12–13, 15–16). Rather, Defendant maintains that it had no notice of Plaintiff's allegations until it received a demand letter from Plaintiff's attorney after her termination. (Id. at 12). Plaintiff's complaints during her employment, Defendant argues, were of a more general nature—they concerned Albert not assisting Plaintiff with her professional duties. (Id. at 3). When it came to Albert's emails, Plaintiff characterized them as "odd" and "weird," but not sexual. (Doc. No. 45 at 5) (citing (Doc. No. 25-11 at 8)).

The Court agrees with Plaintiff that her complaints to Defendant did not have to mention the words "sexual harassment" to constitute a protected activity. See Okoli v. City of Balt., 648 F.3d 216, 224 n.8 (4th Cir. 2011) (noting that other Circuits have also found that no "magic words" are needed to make harassment complaints effective). While her complaints may not have been sufficient to show sexual

harassment, a reasonable jury could believe that the emails Plaintiff forwarded to Toney put Defendant on notice that Plaintiff was alleging it.

ii.    Causation

Plaintiff also establishes a causal link between that protected activity and her termination.  "To prove a causal connection, [Plaintiff] must be able to show that [Defendant] fired [her] 'because the plaintiff engaged in a protected activity.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (quoting Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)); see also Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation….").  The burden for establishing causation at the prima facie stage is not an onerous one.  Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 251 (4th Cir. 2015).

Plaintiff states that the temporal proximity between her complaints to HR and her termination provides a causal link.  (Doc. No. 28 at 19).  "[C]ourts have concluded that the discharge of an employee soon after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation."  Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).  At this stage, to establish causation through temporal proximity alone, the time between Plaintiff's protected activity and her termination must be "very close."  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001); see also Perry v. Kappos, 489 Fed. Appx. 637, 643 (4th Cir. 2012) ("Save for situations in which the adverse employment decision follows the

protected activity 'very close[ly],' 'mere temporal proximity' between the two events is insufficient to satisfy the causation element of the prima facie requirement."). Here, there is a gap of nine business days—two weeks—between her August 31 meeting and her termination on September 14. (Id. at 28–29). This short gap of time is arguably sufficient to fulfill Plaintiff's less onerous burden of proving causation at the prima facie stage of her retaliation claim. See Middleton v. Menlo Logistics, Inc., No. 5:11-3215-JMC-PJG, 2013 U.S. Dist. LEXIS 29478, at *12 (D.S.C. Jan. 24, 2013) (finding the causation element fulfilled when plaintiff was discharged "only a few weeks" after her complaint of retaliatory behavior). While there are limits to the Fourth Circuit's acceptance of temporal relations between a termination and a protected activity, it is usually a gap of months that prevent a Plaintiff from succeeding in her prima facie claim.[3]

### b. Defendant's Legitimate Reason for Plaintiff's Termination

As mentioned above, Defendant claims that its legitimate reason for terminating Plaintiff's employment had nothing to do with her complaints regarding Albert. Rather, Defendant points to Plaintiff's habitual tardiness and her propensity to leave work early. (Doc. No. 25 at 4). To support its position, Defendant presents charts showing the hours Plaintiff worked. Defendant also presents and extensive

---

[3] For example, the Fourth Circuit has found that a three or four-month gap between a protected activity and an employee's discharge was "too long to establish a causal connection by temporal proximity alone." Pascual v. Lowe's Home Ctrs., Inc., 193 Fed. Appx. 229, 233 (4th Cir.2006); see also King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding that a period of two months and two weeks was "sufficiently long so as to weaken significantly the inference of causation between the two events.").

collection of emails that Plaintiff sent Toney providing notice that she would either have to come in late or leave early that day. See (Doc. No. 25-13 at 1–102). The Court finds this explanation sufficiently supported by evidence, shifting the burden onto Plaintiff to prove pretext.

### c. Pretext

Plaintiff fails to prove that Defendant's purported explanation for her termination was nothing but mere pretext. At the pretext stage, Plaintiff carries the "ultimate burden of persuading the court that [she] has been the victim of intentional [retaliation]." Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015) (internal quotation omitted). To do so, Plaintiff "must establish both that the [Defendant's] reason was false and that [retaliation] was the real reason for the challenged conduct." Id. (internal quotation omitted).

While Plaintiff's temporal proximity argument barely sufficed for her prima facie case, it is not alone dispositive at the pretext stage. See Warren v. Halstead Indus., Inc., 802 F.2d 746, 758 (4th Cir. 1986) (finding pretext due to temporal proximity in addition to other evidence). While two weeks separate Plaintiff's last protected activity and her termination, the Court finds a more complex situation than Plaintiff asserts. Plaintiff warned Defendant about Albert's conduct several times. (Doc. No. 40 at 27). Taking her allegations as true, Plaintiff engaged in a protected act as early as May 21, 2015—upwards of three months prior to her termination. (Doc. No. 40 at 9). What's more, Plaintiff cites at least two instances in the record where Defendant engaged Albert to correct his behavior in the wake of her

complaints. First, contact was made with Albert after Plaintiff's August 4th complaint, which led him to send Plaintiff messages such as "no loving for me." Plaintiff admits this. (Id. at 10) ("Greene understood Albert's emails to be in response to her complaints about his sexual advances."). Second, on August 26th, Ells granted Toney permission to talk to Albert about his unprofessional conduct after Plaintiff's complaint on August 24.[4] (Id. at 10, 27–28). Plaintiff presents no evidence that Defendant carried any animus toward her during this time. Rather, instead of retaliation, Plaintiff shows that Defendant attempted to address those allegations on at least two occasions. In the meantime, Plaintiff's absences and tardiness continued. The only arguably retaliatory behavior the Court finds in the record was Albert's, who Plaintiff alleges would become less responsive if she did not entertain his inappropriate emails.

Plaintiff dissects Defendant's comparator charts to establish pretext, concluding that her absentee/tardiness rate was not dissimilar from other employees in similar positions. (Doc. No. 40 at 29–30). Plaintiff, however, does not provide evidence to refute Defendant's argument that other attorneys scheduled their absences and tardiness with advance notice. Plaintiff's emails, on the other hand, show that she would often email Toney the very day that she was running late. Furthermore, Defendant states that other attorneys' work required out-of-office court

---

[4] Ells also states, "Although you told me [Plaintiff] keeps showing up in his office." This statement only confirms Ells' ongoing knowledge of Greene's complaints prior to August 26. Despite this knowledge, Ells did not terminate Plaintiff or show her any hostility or animus. Ells simply told Toney to talk to Albert.

appearances where Plaintiff's work did not. In the end, the Court's role here is not "to decide whether [Defendant's reasoning] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998).

Plaintiff also argues that a question of fact exists regarding whether Plaintiff was told to be at work at a specific time. (Doc. No. 40 at 30). The Court disagrees. Plaintiff's emails to Toney repeatedly state that she would be "late" to work. (Doc. No. 25-13). In one, Plaintiff specifies that she "still might [get to work] on time by 9am." (Id. at 43). These emails are nothing short of admissions illustrating Plaintiff's awareness that she was expected to report to work by at least 9 a.m.

### 3. Plaintiff's remaining state law claim

Plaintiff's Complaint also alleges that Defendant violated North Carolina's Wage and Hour Act. (Doc. No. 1-1). Plaintiff argues that Defendant refused and/or failed to pay wages earned by Plaintiff, resulting in "lost wages in the form of salaries, earned PTO, and promised severance." (Id. ¶43). During oral argument, Defendant requested that the Court dismiss this state law claim in the event it were to grant summary judgment. (Unedited Transcript of Oral Argument at 18:06–20). Defendant emphasized that this remaining claim concerns "only a few thousand dollars" and that it is within the Court's authority to dismiss it in favor of judicial economy. (Id.).

The Court exercises jurisdiction over Plaintiff's state law claim through supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). This statute allows

district courts to decline exercising supplemental jurisdiction if it dismisses all claims which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). "[F]ederal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away." Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir. 1995). In exercising discretion, the Court may consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Id. at 110 (citing Carnegie–Mellon University v. Cohill, 484 U.S. 343, 350 n. 7 (1988)).

Here, Plaintiff's Title VII claims formed the federal basis of her Complaint. In the wake of the Court's ruling in favor of Defendant's Motion for Summary Judgment, that basis has since dropped away. The Court hereby exercises its authority to dismiss Plaintiff's state law Wage and Hour Act claim. There exist no underlying issues of federal policy in it. Nor does the Court see inconvenience to the parties. In fact, Plaintiff filed this case in Mecklenburg County Superior Court prior to Defendant's removal.

## III.   PLAINTIFF'S MOTION TO EXCLUDE EVIDENCE

Also before the Court is Plaintiff's Motion to Strike Defendant's Reply, (Doc. No. 50). Plaintiff moves the Court pursuant to Federal Rules of Civil Procedure 26(e)(1) and 37(c) to exclude certain evidence Defendant relies upon in its argument for summary judgment. (Doc. No. 51 at 1).

A. <u>Defendant's Evidence</u>

Plaintiff aims to exclude the Affidavit of Matthew Hill, portions of Michelle Toney's affidavit, and the 2015 email attached to it. (<u>Id.</u>). Plaintiff states that this evidence was offered by Defendant for the first time in its Reply in Support of Summary Judgment. (<u>Id.</u>).

1. 2015 Email between Plaintiff and Rachel Winchester

Plaintiff argues that a 2015 email between Plaintiff and Rachel Winchester attached to Toney's affidavit was never produced in discovery. (<u>Id.</u> at 5–6). In this email, Plaintiff wrote to Winchester recalling, "[Defendant] knew I had school and told me my hours were going to be 9 to 5 or sometimes 6…." (Doc. No. 44-1 at 5). Defendant offers this evidence to respond to Plaintiff's pretext argument, showing Plaintiff knew the amount of absences she was accruing and the amount of times she was coming in late. (<u>Id.</u>).

Plaintiff correctly cites the Magistrate Judge's order granting Plaintiff's first Motion to Compel Discovery, which included requests for emails exchanged between Plaintiff and Rachel Winchester. (Doc. No. 20 at 5). Defendant produced upwards of 35,619 pages of documents, 2,312 pages of which were produced to comply with the Magistrate Judge's order. (Doc. Nos. 51 at 6; 52 at 3). These documents were purported to include all emails communicated between Plaintiff and Winchester. (<u>Id.</u>). However, Defendant produced this new email for the first time in its Reply in Support of Summary Judgment. (Doc. 45 at 16).

Defendant states that the Magistrate Judge's Order to Compel required all documents to be produced by April 9, 2018. (Doc. No. 52 at 1–2). Plaintiff filed the current motion to strike prior to that deadline on April 5. (Doc. No. 48). Furthermore, Defendant argues that this email contains no surprises to Plaintiff because Defendant already produced another email for the same proposition. In that prior email, Plaintiff told Toney that she would be "on time by 9am." (Doc. No. 25-13 at 43). Finally, Defendant maintains that it did not engage in any efforts to hide the 2015 email from Plaintiff. (Id. at 3).

### 2. Paragraphs 8 and 9 of Toney's Affidavit

Next, Plaintiff requests that the Court strike two paragraphs from Toney's Affidavit, (Doc. No. 44-1), which Defendant attached to its Reply brief in support of its Motion for Summary Judgment. (Doc. No. 51 at 7–8). These paragraphs state:

> A review of the firm's records indicates that Megan Hawn Gilbert was in court on at least 47 of the 59 questioned days in Plaintiff's response. Additionally, 2 of the days questioned were weekend days. I made this determination through review of the daily schedules and the 2015 calendar.

> A review of the firm's records indicate that Candace Tanner was in court on at least 20 of the 24 questioned late days in Plaintiff s response. I made this determination through review of the daily schedules.

(Doc. No. 44-1 at ¶¶ 8–9). Plaintiff argues that these statements should be excluded because "Defendant refused to produce any documents, 'daily schedules,' or attendance records for the other attorneys employed by Defendant during 2015." (Doc. No. 51 at 8).

Defendant merely asserts that the documents have since been provided to Plaintiff. (Doc. No. 52 at 5).

### 3. Affidavit of Matthew Hill

Next, Defendant objects to Defendant's affidavit of Matthew Hill. (Doc. No. 44-2). In that affidavit, Hill testifies that Plaintiff's behavior and interactions toward him were often disruptive, unprofessional, and evolved into a flirtatious manner. (Id. ¶¶ 6–8).

Defendant states that it disclosed Hill as a potential witness in its December 29, 2017, supplemental disclosure. (Doc. No. 52 at 5). In that disclosure, Defendant stated that Hill, among others, "…will testify that Laura Greene interrupted their work duties during working hours to engage in non-business-related conversations and emails." (Id.). Defendant points out that Plaintiff chose not to depose Hill.

### B. <u>Legal Standard</u>

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion … unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). There is a five-factor test for determining whether nondisclosure of evidence is substantially justified or harmless: "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to [disclose the evidence] before

trial; and (5) the importance of the [evidence]." <u>S. States Rack And Fixture, Inc. v.</u> <u>Sherwin-Williams Co.</u>, 318 F.3d 592, 596 (4th Cir. 2003) (internal quotation omitted).

C. <u>Discussion</u>

The Court **DENIES** Plaintiff's Motion to Strike. It appears that Defendants have produced all discovery documents and have done so prior to the deadline established by the Magistrate Judge. Furthermore, none of the evidence above should come as a surprise to Plaintiff. As Defendant mentions, it had previously presented emails written by Plaintiff where she references 9 a.m. as her daily start time. Defendant provided several detailed charts of comparator start times prior to disclosing daily schedules or attendance records. Furthermore, Defendant listed Matthew Hill as a witness in its December disclosure.

The Court also notes the sheer amount of documents transferred by Defendant—35,619 pages worth. Defendant submitted an affidavit of Sara Gillenwater, who assisted Defendant's counsel with the preparation of these documents. (Doc. No. 52-1). Ms. Gillenwater testified that the firm unintentionally skipped documents it otherwise believed to have sent to Plaintiff's counsel. (<u>Id.</u> ¶¶4– 6). This mistake, Ms. Gillenwater explained, was due to the vast number of documents involved and a tight deadline. (<u>Id.</u> ¶7). The Court finds: (1) this explanation sufficient; (2) that some of the documents that were included in the Reply were responsive to issues raised by Plaintiff for the first time in her Response; and (3) that Defendant did not exclude the production of these documents in bad faith.

## IV.  CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1.  Defendant's Motion for Summary Judgment, (Doc. No. 24), is **GRANTED;**

2.  Plaintiff's state law claim is **DISMISSED WITHOUT PREJUDICE;**

3.  Plaintiff's Motion to Strike, (Doc. No. 50), is **DENIED**.

Signed: June 15, 2018

Robert J. Conrad, Jr.
United States District Judge

SEALED DOCUMENT with access to All Parties/Defendants.